442 A.2d 265

The FIDELITY BANK,

v.

S. Marshall GORSON, Claire G. Axelrod and Leonard Axelrod, Executors of the Estate of Joseph S. Gorson, Deceased, Harry F. Glazar and S. Marshall Gorson, Individually and t/a Gorson Enterprises, a Pennsylvania Limited Partnership.

Appeal of Harry F. GLAZAR.

The FIDELITY BANK,

v.

S. Marshall GORSON, Claire G. Axelrod and Leonard Axelrod, Executors of the Estate of Joseph S. Gorson, Deceased, Harry F. Glazar and S. Mitchell Gorson, Individually and t/a Gorson Enterprises, a Pennsylvania Limited Partnership.

Appeal of S. Marshall GORSON, Claire G. Axelrod and Leonard Axelrod, Executors of the Estate of Joseph S. Gorson, Deceased.

The FIDELITY BANK, Appellant,

v.

S. Marshall GORSON, Claire G. Axelrod and Leonard Axelrod, Executors of the Estate of Joseph S. Gorson, Deceased, Harry F. Glazar and S. Marshall Gorson, Individually and t/a Gorson Enterprises, a Pennsylvania Limited Partnership.

1

2

Superior Court of Pennsylvania.

Argued May 6, 1981.

Filed Feb. 26, 1982.

Walter W. Rabin, Philadelphia, for appellants (at Nos. 1885 & 1958) and for appellees (at No. 2066).

Marc J. Sonnenfeld, Philadelphia, for Fidelity, appellant (at No. 2066) and for appellee (at Nos. 1885 & 1958).

Before SPAETH, CAVANAUGH and LIPEZ, JJ.

CAVANAUGH, Judge:

These cases involve appeals from court orders upon petitions to open and strike judgments which were entered upon a promissory note by The Fidelity Bank against S. Marshall Gorson, The Estate of Joseph N. Gorson and Harry F. Glazer, individually and trading as Gorson Enterprises. The note was an unsecured demand note in the amount of three million dollars dated May 23, 1978. It contained a provision empowering Fidelity to confess judgment against the maker at any time before or after maturity. A confession of judgment was entered on the note pursuant to a complaint filed in the Common Pleas Court of Philadelphia County on January 11, 1980. S. Marshall Gorson and Glazer filed petitions to open the confessed judgments. Gorson and the executors of the Estate of Joseph N. Gorson, who had been a maker of the note but had deceased, filed petitions to strike the judgment. The court opened the judgment as to S. Marshall Gorson and denied the petitions filed on behalf of Glazer and the Estate of Joseph N. Gorson. Fidelity has appealed the opening of the S. Marshall Gorson judgment and Glazer and the Gorson Estate have appealed from the order denying their petitions. The three appeals have been consolidated and Fidelity has been designated appellant pursuant to Pa.R.A.P. 2136.

I

## Fidelity v. S. Marshall Gorson

■ After the execution of the note and as a result of certain disputes which had arisen with Fidelity, S. Marshall Gorson entered into negotiations and eventually reached a supplemental agreement with the bank dated October 23, 1979. This agreement contained the following provision relevant to the present dispute:

Gorson (together with others) owes Bank $3,000,000 on a demand basis. *Bank agrees not to demand any payment of principal from Gorson for a period of one year from the date hereof, except upon a default in payment of interest by Gorson during that period.* Bank agrees that no payment of interest shall be due or payable for a period of sixty days from the date hereof. Thereafter, interest shall be payable at the same rate and at the same intervals as heretofore. Interest which has accrued during the sixty-day period shall become due upon maturity of the note. (Emphasis added).

Following entry of the judgment Fidelity did not seek to execute upon the judgment or obtain payment of the principal. The judgment was entered, said the bank, only for purposes of security. Gorson, on the other hand, argued that under the October supplemental agreement Fidelity was entitled to take action upon the note only in the event that interest was not paid, an event which had not occurred. Thus the issue is whether under the parties' agreement the bank had the right to enter judgment solely for the purpose of creating a lien for security. The lower court found that the entry of judgment on the demand note was in fact a "demand" in contravention to the above quoted provision of the agreement between the parties which prohibited for one year any demand for payment of principal. The parties are not in disagreement that under Pennsylvania law a judgment note may ordinarily be employed as a security device and that the judgment may be entered at any time. An early Pennsylvania case recognized the general right to employ a note as security. The court stated:

The difficulty in the view of the appellee, and apparently of the learned court below, is in failing to distinguish between the present right of the plaintiff to his judgment as security for a debt payable in the future, and the right to execution or satisfaction on a debt presently due. As security, the creditor has a right to as large collateral, and as many different forms of it, as the parties chose to contract for. That is a matter with which the court cannot interfere. But the enforcement of satisfaction, by execution or otherwise, is a matter to be governed by the rights and equities of the parties, and comes within the jurisdiction of the court. In the present case the creditor did nothing more than enter up his judgment on the bond, as part of the security agreed on. In so doing he was within his strict legal rights, and the court had no authority to interfere with his action.

*Integrity Title Insurance, Trust & Safe Deposit Company v. Rau,* 153 Pa. 488, 491–92, 26 A. 220 (1893).

The right to enter judgment on a note has been stated to be present whenever the note is silent as to when judgment may be taken. *Triangle Building Supplies & Lumber Company v. Zerman,* 242 Pa.Super. 315, 363 A.2d 1287 (1976). *See also General Electric Credit Corporation v. Slawek,* 269 Pa.Super. 171, 409 A.2d 420 (1979). The provision in the October agreement is that "[the] *Bank agrees not to demand any payment of principal from Gorson* for a period of one year from date hereof, except upon a default in payment of interest by Gorson during that period." (emphasis added). Since there was no execution, or threat of execution upon the judgment, the act of confessing the judgment was not a demand under a fair reading of this provision. The provision simply insulates Gorson from the obligation to make any payment of the principal sum for a period of one year so long as interest payments are made. The lower court has relied upon two cases in concluding that the entry of judgment was prohibited by the conditional "demand" language of the October agreement. In *Better Bilt Door Co. v. Oates,* 165 Pa.Super. 465, 69 A.2d 425 (1949), the entry of judgment

was held to constitute a sufficient demand to initiate the payment of interest under a note which required a demand before interest became due. In *Dominion Trust Co. v. Hildner*, 243 Pa. 253, 90 A. 69 (1914), it was held that entry of judgment was sufficient demand so as to negate the need for a prior demand before instituting suit on a note. We think that these cases are not inapposite since they represent a reasonable interpretation of the intent of the parties. Likewise, in this case we conclude that it would unreasonably strain the language of the October agreement to interpret it as precluding the entry of judgment for security. The parties in reaching the terms of the negotiated October agreement could have altered the rights under the original note by prohibiting the entry of judgment on the note by so providing, but they failed to do so. We disagree with the lower court which concluded that entry of judgment was violative of the terms of the October agreement. The order of the court opening the judgment against S. Marshall Gorson is reversed and judgment is reinstated.

## II

### *Fidelity v. Estate of Joseph N. Gorson, Deceased*

■ Joseph N. Gorson was one of the makers of the judgment note dated May 23, 1978. He died on February 4, 1979. The Gorson Estate was not a party to the October 1979 agreement discussed in the case of S. Marshall Gorson, *supra*. Judgment was entered against the Estate on January 11, 1980. This appeal is from the refusal of the lower court to strike judgment on a demand note after the death of the maker. On close analysis we are unable to accept Fidelity's conclusion that the cases distinguish between situations where the right to confess judgment is contingent upon a default which occurs after the maker's death, and the right to enter judgment on a note (as here) not contingent upon a default, and that they permit the entry of judgment in the latter situation. A reading of the cases does not make such a distinction cognizable under Pennsylvania law. Rather, the cases indicate that the maker's demise terminates the

warrant of attorney to confess judgment. *First Federal Savings and Loan Association v. Porter*, 408 Pa. 236, 183 A.2d 318 (1962). It is true that the early case of *Webb v. Wiltbank*, 1 Clark 324, 2 Pa.L.J. 303 (1842) is cited by the lower court as support for the principle that the death of the maker does not void the warrant to confess. However, this authority is merely a brief summary of a lower court decision and in light of later pronouncements by the Pennsylvania Supreme Court is of doubtful authority.

It is also true that the validity of the "death voids warranty" principle has been questioned. In *Brennan v. Ennis*, 219 Pa.Super. 291, 280 A.2d 605 (1971), the court stated:

> Cases citing the general rule that judgment cannot be entered by confession after the maker's death have done so without discussion of any underlying rationale. *Stucker v. Shumaker*, 290 Pa. 348, 351, 139 A. 114 (1927); *First Fed. Savings and Loan Ass'n of Green County v. Porter*, 408 Pa. 236, 241, 183 A.2d 318 (1962); *Kummerle v. Cain*, [82 Pa.Super. 528] supra; *Kingston Nat. Bk. v. Walters et ux.*, supra. *Kummerle v. Cain*, [163 Pa.Super. 624, 63 A.2d 380] supra (1924), is the latest Pennsylvania appellate case actually implementing the rule, and recent cases have placed possible reasons for the rule in question. See *Mid-City Federal Savings and Loan Ass'n of Phila. v. Allen*, 413 Pa. 174, 196 A.2d 294 (1964); *Chaniewicz v. Chaniewicz*, 214 Pa.Super. 294, 257 A.2d 605 (1969); Restatement of Agency 2d, §§ 138, 139(1)(d); Annot., 44 A.L.R. 1309, 1311 et seq.

219 Pa.Super. at 294 n.1, 280 A.2d at 606 n.1.

Indeed, in *Mid-City Federal* cited by the *Brennan* decision as one of the cases questioning the authority of the no entry of judgment after the maker's death line of cases, Justice Eagen wrote in a case involving mental incompetency of the maker:

> A power of attorney to confess judgment for a proper consideration is security to the creditor, is coupled with an interest and is irrevocable. *The entry of the judgment is*

*not a new act of the debtor, but is a legal result beyond his control.* Lunacy will not revoke a power of attorney to confess judgment, which was valid when executed.

413 Pa. at 175, 196 A.2d at 294 (citations omitted, emphasis added).

From this it is argued that the proper rule is that an irrevocable power which was validly granted and which requires no further occurrence to become operative does not terminate upon the grantor's death or incompetence. It is contended that while the authority in a note that permits confession of judgment after a default might expire on the death of the maker, the authority in a note which, as here, permits the entry of judgment at any time does not. The other case cited by *Brennan* as questioning the rule, *Chaniewicz*, involves the post death entry of a judgment on a support order which had been fully litigated and had fixed the decedent's obligations prior to his death.

■ Despite the report of the early *Wiltbank* case and the question raised in *Brennan* we hold that it is the law of Pennsylvania that the death of the maker revokes the warrant to confess judgment even for purposes of security and even if the warrant is not contingent upon a default under the obligation. In so holding we are persuaded by the following line of cases which support our conclusion.

In *Lanning v. Pawson*, 38 Pa. 480, 486 (1861), it was held that:

It was manifestly very proper ... to strike off the judgment that had been entered on the warrant of attorney, on the fact being found that the defendant was dead before it was entered.

In *Kummerle v. Cain*, 82 Pa.Super. 528, 529 (1924), the court stated:

The authorities in this state are to the effect that a judgment entered by confession on the authority accompanying a simple promise to pay money, after the death of the promisor and without an action brought in the lifetime of such party is irregular and will be vacated [on application].

In *Stucker v. Shumaker*, 290 Pa. 348, 351, 139 A. 114 (1927) it was stated that:

> The warrant to confess . . . lost its efficacy when the maker died.

In *Kingston National Bank v. Walters*, 163 Pa.Super. 624, 626, 63 A.2d 380, 381 (1949) it was held that:

> It is the rule that a judgment entered by confession after the death of the maker will be stricken off.

*See also: First Federal Savings & Loan Association v. Porter, supra; Ehnes v. Kissinger*, 364 Pa. 334, 72 A.2d 65 (1950); Shuchman, Judgment Notes in Pennsylvania, § 23.1, p. 83 (1961). Nor can we accept Fidelity's claim that even if the death of the maker prevents the holder from executing on the note, that entry of judgment for security purposes only is permissible. We do not find this distinction to be supported by the cases. Rather, the language of our Supreme Court is absolute. In *Strucker v. Shumaker, supra,* the court stated "the warrant to confess . . . lost its efficiency when the maker died." And in *First Federal Savings and Loan, supra,* it was stated at page 241 that: "[the maker's] demise automatically terminated the warrant of attorney to confess judgment." The order of the lower court is reversed and the judgment entered in favor of Fidelity Bank against the Estate of Joseph N. Gorson, Deceased, is ordered stricken.

### III

#### *Fidelity v. Harry R. Glazer*

The only argument made on behalf of Glazer is that the lower court erred in not permitting the opening of the judgment since Glazer is a third party beneficiary of the October agreement which should be held to prohibit the entry of judgment. We need not reach the issue of whether Glazer is a third party beneficiary of the Fidelity—S. Marshall Gorson agreement since we have already held that that agreement did not prevent Fidelity from entering judgment

for purposes of security against the maker of the note. The order of the lower court as to Harry F. Glazer is affirmed.

SPAETH, J., files concurring and dissenting opinion.

SPAETH, Judge, concurring and dissenting:

I join in Parts I and III of the majority opinion. But I dissent from Part II. For I am unable to agree with the majority's conclusion, slip op. at 269, that "the death of the maker revokes the warrant to confess judgment even for purposes of security and even if the warrant is not contingent upon a default under the obligation."

Professor Seavey noted in his article, *Termination by Death of Proprietary Powers of Attorney*, 31 Yale Law Journal 283, 286 (1921), that

[t]he first case in the United States raising the question of the termination of [an agency] power by death of the grantor was that of *Bergen v. Bennett* in which Chancellor Kent held that a power of sale in a mortgage was a "power coupled with an interest" and was not affected by the death of the mortgagor. It was *Hunt v. Rousmanier's Administrators*, however, which proved to be the foundation of later American cases.

In *Hunt v. Rousmanier's Administrators*, 8 Wheat. 174, 5 L.Ed. 589 (1823), Rousmanier had given Hunt a power of attorney to sell certain vessels as security for the repayment of a loan. Rousmanier died insolvent without having repaid the loan. When Hunt sued to recover, Rousmanier's administrator demurred. The lower court sustained the demurrer. Although Chief Justice Marshall reversed the order of the lower court and remanded the case for argument on the issue of mutual mistake, he outlined the law of agency as applied to a power of attorney held as security for a debt:

This instrument contains no words of conveyance or of assignment, but is a simple power to sell and convey. As the power of one man to act for another depends on the will and license of that other, the power ceases when the will, or this permission, is withdrawn. The general rule,

therefore, is, that a letter of attorney may, at any time, be revoked by the party who makes it; and is revoked by his death. But this general rule, which results from the nature of the act, has sustained some modification. Where a letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally made irrevocable in terms, or if not so, is deemed irrevocable in law. Although a letter of attorney depends, from its nature, on the will of the person making it, and may, in general, be recalled at his will, yet, if he binds himself for a consideration, in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. Rousmanier, therefore, could not, during his life, by any act of his own, have revoked this letter of attorney. But does it retain its efficacy after his death? We think it does not. We think it well settled, that a power of attorney, though irrevocable during the life of the party, becomes extinct by his death.

This principle is asserted in Littleton (sec. 66.), by Lord Coke, in his commentary on that section (52b.), and in Willes' Reports (105, note, and 565). The legal reason of the rule is a plain one. It seems founded on the presumption that the substitute acts by virtue of the authority of his principal, existing at the time the act is performed; and on the manner in which he must execute his authority, as stated in *Coombes'* case.[1] In that case it was resolved that "when any has authority as attorney to do any act, he ought to do it in his name who gave the authority." The reason of this resolution is obvious. The title can, regularly, pass out of the person in whom it is vested, only by a conveyance in his own name; and this cannot be executed by another for him, when it could not, in law, be executed by himself. A conveyance in the name of a person who was dead at the time, would be a manifest absurdity.

This general doctrine, that a power must be executed in the name of a person who gives it, a doctrine founded on

the nature of the transaction, is most usually engrafted in the power itself. Its usual language is, that the substitute shall do that which he is empowered to do in the name of his principal. He is put in the place and stead of his principal, and is to act in his name. This accustomed form is observed in the instrument under consideration. Hunt is constituted the attorney, and is authorized to make, and execute, a regular bill of sale in the name of Rousmanier. Now, as an authority must be pursued, in order to make the act of the substitute the act of the principal, it is necessary that this bill of sale should be in the name of Rousmanier; and it would be a gross absurdity that a deed should purport to be executed by him, even by attorney, after his death; for the attorney is in the place of the principal, capable of doing that alone which the principal might do.

This general rule, that a power ceases with the life of the person giving it, admits of one exception. If a power be coupled with an "interest," it survives the person giving it, and may be executed after his death.

As this proposition is laid down too positively in the books to be controverted, it becomes necessary to inquire what is meant by the expression, "a power coupled with an interest." Is it an interest in the subject on which the power is to be exercised, or is it an interest in that which is produced by the exercise of the power? We hold it to be clear that the interest which can protect a power after the death of a person who creates it, must be an interest in the thing itself. In other words, the power must be engrafted on an estate in the thing.

The words themselves would seem to import this meaning. "A power coupled with an interest" is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But if we are to understand by the word "interest," an interest in that which is to be produced by the exercise of the power, then they are never united. The power, to produce the interest, must be exercised, and by its exercise, is extin-

guished. The power ceases when the interest commences, and, therefore, cannot, in accurate law language, be said to be "coupled" with it.

But the substantial basis of the opinion of the court on this point, is found in the legal reason of the principle. The interest or title in the thing being vested in the person who gives the power, remains in him, unless it be conveyed with the power, and can pass out of him only by a regular act in his own name. The act of the substitute, therefore, which, in such a case, is the act of the principal, to be legally effectual, must be in his name, must be such an act as the principal himself would be capable of performing, and which would be valid if performed by him. Such a power necessarily ceases with the life of the person making it. But if the interest, or estate, passes with the power, and vests in the person by whom the power is to be exercised, such person acts in his own name. The estate, being in him, passes from him by a conveyance in his own name. He is no longer a substitute, acting in the place and name of another, but is a principal acting in his own name, in pursuance of powers which limit his estate. The legal reason which limits power to the life of the person giving it, exists no longer, and the rule ceases with the reason on which it is founded. The intention of the instrument may be effected without violating any legal principle.

*Id.* at 198, 5 L.Ed. at 596 (footnotes omitted).

Finding that "the power given in this case is a naked power of attorney, not coupled with an interest," *id.* at 202, 5 L.Ed. at 597, the Chief Justice concluded that Hunt's interest did not survive the death of Rousmanier. Thus Hunt lost his position as a secured party despite the parties' undisputed intention to the contrary.[1]

1. In its opinion, the Court acknowledged the parties' intention, stating that "[i]t remains to inquire, whether the appellant is entitled to the aid of this Court to give effect to the intention of the parties to subject the interest of Rousmanier in the Nereus and Industry to the payment of the money advanced by the plaintiff on the credit of those vessels, the instrument taken for that purpose having totally

Since 1823, when *Hunt v. Rousmanier's Administrators* was decided, many courts "have seen the equity of the situation and have attempted to avoid the consequences of Marshall's opinion." Seavey, *supra* at 294. The result has been great confusion:

> The courts are not at all clear, save in England, as to what constitutes a power coupled with an interest. . . . in many cases the American courts have used "power coupled with an interest" as meaning a contractual power. When a square determination as to the termination of the power by death has been presented, there are a variety of holdings. Thus where a legal title to real estate is given to a power holder, it is everywhere held that the title survives. Where there is a legal lien upon real property, it would seem that the existence of the lien should be held to create an interest and make the power nonterminable. But some of the courts, finding that the power of sale can not be exercised in the name of the mortgagee, hold that the power terminates with the death of the mortgagor. Where there is less than a lien, the courts have generally held that the power does not survive upon the ground that the power can not be exercised in the name of a dead man. Seavey, *supra* at 297.

This confusion is apparent in the Pennsylvania cases. While many cases accord with the majority's view, others have held the power of attorney to survive the grantor's death. In *Keys's Estate*, 137 Pa. 565, 20 A. 710 (1890), Daniel Keys died after having executed a power of attorney to his sister authorizing her to collect the proceeds from a real estate sale and to keep so much of the money as was necessary to repay a debt he owed her. Upholding the power, the Court stated:

> The manifest purpose of Daniel Keys was to specifically appropriate so much of his share in his brother's estate as was necessary to pay the indebtedness therein mentioned; and, to that end, he invested his sister with full authority

failed to effect its object." *Hunt v. Rousmanier's Administrators, supra* at 206, 5 L.Ed. at 598.

to receive the money that was coming to him from the land that was then about being sold, and credit the same on account of that indebtedness. There is nothing in the evidence to indicate any other intention. The land referred to in that and subsequent letters is undoubtedly the same that was shortly afterwards sold under the proceedings in partition, and the money in court is part of the proceeds of that sale. What, then, was the effect of the power of attorney and accompanying letter, both of which appear to have been delivered to appellant at the same time? Without pausing to inquire what is necessary to constitute a power coupled with an interest, and wherein it differs from a specific appropriation of property, or the proceeds thereof, to the payment of a particular debt, or for any other special purpose, we are of opinion that the power of attorney and letter above quoted operated as an equitable assignment to appellant of so much of Daniel Keys's interest in the estate of his brother John as would be sufficient to pay the indebtedness of $250, and interest, specified in the letter. To that extent, appellant thereby acquired a vested right to the purchase money raised by the sale in partition, and that right was not divested by the subsequent death of Daniel Keys in April, 1887. *Id.*, 137 Pa. at 568–69, 20 A. 710.[2]

2. The Court has used the theory of equitable assignment to save a power of attorney in circumstances other than the death of the principal. In *Lightner's Appeal*, 82 Pa. 301 (1976), the Court upheld a power of attorney after the bankruptcy of the principal.

The bill set forth substantially, that on the 9th of June 1875, Frank J. Herr was adjudged a bankrupt, and on the 12th of August following, Joel L. Lightner was duly appointed assignee of his estate; that the said Herr at the time of the assignment was the owner of sixty-three shares of the capital stock of the First National Bank of Strasburg, and as such owner had drawn the dividends thereon to the time of the commencement of the proceedings in bankruptcy; that by these proceedings the title to this stock was vested in the assignee; that said bank claimed to hold said stock by virtue of an alleged transfer as collateral security for an indebtedness of said bankrupt to the bank, and in pursuance of said claim, the directors of said bank had directed the stock to be sold; that it is denied that said bank is entitled to said stock or that it has ever been transferred to the bank, or that it had any interest therein, and that it is the duty of said assignee to sell said stock for

For cases upholding a power of attorney after the grantor's death where the grantor had delivered to the holder the property securing the debt, *see In Fisher v. New York & Middle Coal Field R. & Coal Co.*, 31 Wkly. Notes Cas. 502 (1892), and *Droste's Estate*, 9 Wkly. Notes Cas. 224 (1880).

The present case is of course distinguishable from such cases. Fidelity Bank was neither equitably assigned nor given possession of specific property as security for the debt. But such requirements seem archaic. Fidelity's power of attorney was "coupled with an interest" insofar as its exercise was to benefit the holder and not the creator. Had Fidelity taken control of property sufficient to secure its three million dollar debt, it is unlikely that Gorson Enterprises could have been maintained as a going business. The effect of the majority opinion is to interfere with, if not make unavailable, a sensible commercial divorce.

The American Law Institute's treatment of the problem of irrevocable agency reflects such commercial considerations. Instead of defining when a power is "coupled with an interest," Restatement (Second) Agency emphasizes the concept of security. Section 138 provides:

> the benefit of the estate of the bankrupt, and he therefore prays the court to grant an injunction to restrain the bank from selling and transferring the stock and for an order to permit the assignee to transfer the same.
> *Id.* at 302.

The Court refused to enjoin the bank from selling the stock and held instead that the power of attorney

> was not only by its own terms irrevocable for value received, but it was so by the legal operation of the agreement which induced it. It is a power coupled with an interest, and was made and executed for the very purpose of carrying the agreement into performance. When a power of attorney is thus adopted by the parties, as the means of carrying out their valid agreement made upon sufficient consideration, its operation must be sustained upon the nature and purpose of the contract to which it is ancillary and which it is intended to effectuate. If the effect of the contract, *inter partes*, is, as here, to give a right of property or interest in the subject-matter itself of the agreement, to the party for whose benefit the execution of the power is intended, the power follows the estate or interest thus agreed to be transferred, and becomes irrevocable by operation of law.
> *Id.* at 304–305.

## § 138.  Definition

A power given as security is a power to affect the legal relations of another, created in the form of an agency authority, but held for the benefit of the power holder or a third person and given to secure the performance of a duty or to protect a title, either legal or equitable, such power being given when the duty or title is created or given for consideration.

Section 139 defines the circumstances in which a power given as security may be terminated:

## § 139.  Termination of Powers Given as Security

(1) Unless otherwise agreed, a power given as security is not terminated by:

(a) revocation by the creator of the power;

(b) surrender by the holder of the power, if he holds for the benefit of another;

(c) the loss of capacity during the lifetime of either the creator of the power or the holder of the power;  or

(d) the death of the holder of the power, or, if the power is given as security for a duty which does not terminate at the death of the creator of the power, by his death.

(2) A power given as security is terminated by its surrender by the beneficiary, if of full capacity;  or by the happening of events which, by its terms, discharges the obligations secured by it, or which makes its execution illegal or impossible.

In the Comment to Section 139 it is said:

\*     \*     \*     \*     \*     \*

*d.  Death.*  If the power holder dies, a court of equity will direct the exercise of the power for the benefit of the beneficiary.  If the creator of the power dies and the power is given to secure the performance of a duty not terminated by the death of the power giver, the power survives.

Among the illustrations to the Section are the following:

\*     \*     \*     \*     \*     \*

5. P sells shares in a corporation to A and delivers to A his share certificate, and a power of attorney to transfer the shares upon the books of the corporation. P dies before the shares are transferred upon the books. A's power to make the transfer is not terminated.

6. P borrows money from A and as security gives A a power, in case of P's default in payment, to collect a debt owed by T to P and to pay himself out of the proceeds. A's power to collect the debt is not affected by the death of P.

7. P borrows money from A, and as security in case of nonpayment, gives A a power of attorney to take and sell certain ships belonging to P, then at sea. P makes default in payment, and A takes possession of the ships in pursuance of the power. P dies. A can now sell the ships, notwithstanding P's death.

This formulation of the law first appeared in Preliminary Draft # 54, which was issued by the American Institute of Law in 1932 (Professor Seavey acting as Reporter). The draft was accompanied by an explanatory Note to the Council, which stated:

*Note to the Council*: This Section is a departure from the corresponding Sections in the Second Tentative Draft (§§ 233, 234 and 235) in that it states that a power given for security is not terminated by the death of the power giver. In § 233 it was stated that a power of attorney given as security is terminated by "... (e) the death of the giver of the power except as stated in § 235." In § 235 it was stated: "A power given as security is not terminated by the death of the giver of the power if such power (a) constitutes a term in or a part of the creation of a legal or equitable estate in or mortgage upon property of the person giving the power, or (b) forms a part of a transaction which creates a legal or equitable lien upon property of such giver, or (c) forms a part of a transaction which constitutes a legal or equitable assignment of the whole or a part of a debt or demand due to such giver, or (d) forms a term in a transaction amounting to a pledge of

property of such giver, or (e) is a term in a contract whose obligations survive against such giver's estate, and which grants rights to receive, retain, possess or appropriate property of such giver."

These Sections were written in light of the case of *Hunt v. Rousmanier*, 8 Wheat. 174 [5 L.Ed. 589] (1823). In this case, the owner of a vessel in borrowing money gave as security a power of sale of the vessel, this being given rather than a mortgage, in order that there should be no change in registration. The court held that the power terminated with the death of the grantor of the power. The American courts have professed to follow the authority of this case but have distinguished the cases involving the point so that it may be fairly said that today in substantially all situations in which a power has been given, the death of the giver of the power does not terminate it. The only cases in which it can be said to have any remaining validity are those where the power is given in reference to land and in which the court finds that it was not intended to give either an equitable interest in the land or a lien upon it. The cases holding that the power terminates upon the death of the giver are almost all fifty years old or more, and the rule does not accord with the modern idea that one having a power in regard to something has an interest in it. It may fairly be said therefore that with the change of view in regard to the creation of an interest in things, in every case where a power of this sort is created, the rule as stated satisfies the requirement of Marshall in *Hunt v. Rousmanier*, that in order to survive a power must be coupled with an interest. The views of the Reporter upon this matter were expressed in 31 Yale Law Journal 283 (1922). The more recent case of *Mulloney v. Black*, 244 Mass. 391 [138 N.E. 584] (1923) is typical since, although citing *Hunt v. Rousmanier*, it held that a power to appropriate money due the power giver was not terminated by his death. The original sections purported to follow *Hunt v. Rousmanier* but a critical examination of them shows that their meaning is substantially similar to that of the present

20

Section. It appears to the Reporter that it will serve the profession better to state frankly that the law as to these powers has become consistent with the law of contracts and property.

Preliminary Draft of Restatement of Agency # 54 at 155–57 (1934).

In my opinion, the American Law Institute has stated the better rule, and we should adopt it. I acknowledge that doing so would be inconsistent with some cases. But it would be consistent with others, and would bring our law up-to-date by recognizing the practical considerations of the commercial world.

As to the Estate of Joseph N. Gorson, the order of the lower court should be affirmed.